United States Court of Appeals
For the First Circuit

No. 98-1513

UNITED STATES OF AMERICA,

Appellant,

v.

DAVID HILTON,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Boudin, Circuit Judge,

Coffin and Bownes, Senior Circuit Judges.

F. Mark Terison, Assistant United States Attorney, with whom
Jay P. McCloskey, United States Attorney, and Gail Fisk Malone,
Assistant United States Attorney, were on brief for appellant.
Peter E. Rodway for appellee.
Lisa R. Green, Michael A. Bamberger, and Sonnenschein Nath &
Rosenthal, for American Booksellers Foundation For Free Expression,
Freedom To Read Foundation, International Periodical Distributors
Association, Periodical and Book Association of America, Inc.,
Publishers Marketing Association, Video Software Dealers
Association, General Media Communications, Inc.; R. Bruce Rich and
Jonathan Bloom for Association of American Publishers, Inc., on
brief for amici curiae. 

January 27, 1999

BOWNES, Senior Circuit Judge. In 1996, Congress enacted
the Child Pornography Prevention Act (the "CPPA"), 18 U.S.C.
2252A, to attack the rise of computerized or "virtual" child
pornography. These images may take many forms a photograph of
a real child may be scanned and replicated, an innocent picture of
a child may be manipulated by computer to create a sexually-
oriented photo, or a fake child (ranging from a simple cartoon
character to a high-resolution image resembling a real child) can
be generated wholly by computer graphics. 
The law prohibits, inter alia, knowing possession of
visual images depicting minors or those who "appear to be" minors
engaging in sexually explicit conduct. This case presents
constitutional issues of first impression in this circuit: whether
the CPPA's definition of child pornography is so overbroad as to
contravene the First Amendment or so vague as to violate due
process. 
In resolving defendant David Hilton's motion to dismiss
the indictment in his favor, the United States District Court for
the District of Maine answered both questions in the affirmative. 
The court was troubled by a perceived difficulty in determining
whether a depicted person appeared to be under 18 years old and by
its belief that the statute impermissibly criminalizes possession
of adult pornography. 
We reverse. We hold that the law, properly construed,
survives Hilton's facial constitutional challenge. It neither
impinges substantially on protected expression nor is so vague as
to offend due process. 
I
We assess the constitutionality of the CPPA de novo. SeeUnited States v. DeLuca, 137 F.3d 24, 40 n.19 (1st Cir. 1998). In
doing so, we must carefully consider fundamental constitutional
norms in light of recent technological advances to determine
whether Congress's objectives and the statutory scheme it has
established are in accord with our constitutional design.
We begin by providing an overview of the CPPA and by
considering the underlying legislative purposes of the Act. 
Congress enacted the CPPA to modernize federal law by enhancing its
ability to combat child pornography in the cyberspace era. See S.
Rep. No. 104-358, at pt. I (1996) (declaring that statute addresses
"problem of 'high-tech kiddie porn'"). Lawmakers wished to improve
law enforcement tools to keep pace with technological improvements
that have made it possible for child pornographers to use computers
to "morph" or alter innocent images of actual children to create a
composite image showing them in sexually explicit poses. Through
readily available desktop computer programs, one can even create a
realistic picture of an imaginary child engaged in sexual activity
and pass off that creation as an image of a real child. 
The statute's operative provisions, taken together,
criminalize the reproduction, possession, sale, and distribution of
child pornography. See 18 U.S.C. 2252A(a). They also prohibit
the pandering of material as child pornography by making it a crime
to advertise, promote, or present material "in such a manner that
it conveys the impression that the material is, or contains" child
pornography. 18 U.S.C. 2256(8)(D). 
The statute defines child pornography as: 
any visual depiction, including any photo-
graph, film, video, picture, or computer or
computer-generated image or picture, whether
made or produced by electronic, mechanical, or
other means, of sexually explicit conduct,
where (A) the production of such visual
depiction involves the use of a minor engaging
in sexually explicit conduct; (B) such visual
depiction is, or appears to be, of a minor
engaging in sexually explicit conduct;
(C) such visual depiction has been created,
adapted, or modified to appear that an
identifiable minor is engaging in sexually
explicit conduct; or (D) such visual depiction
is advertised, promoted, presented, described,
or distributed in such a manner that conveys
the impression that the material is or
contains a visual depiction of a minor
engaging in sexually explicit conduct . . . .

18 U.S.C. 2256(8). A "visual depiction" includes but is not
necessarily limited to "undeveloped film and videotape, and data
stored on computer disk or by electronic means which is capable of
conversion into a visual image." 18 U.S.C. 2256(5). A "minor,"
in turn, means "any person under the age of eighteen years." 18
U.S.C. 2256(1). Sexually explicit conduct is described as
"actual or simulated (A) sexual intercourse, including genital-
genital, oral-genital, anal-genital, or oral-anal, whether between
persons of the same sex or opposite sex; (B) bestiality; (C)
masturbation; (D) sadistic or masochistic abuse; or (E) lascivious
exhibition of the genitals or pubic area of any person." 18 U.S.C.
2256(2). 
There is some overlap in the definition of child
pornography material created by manipulating an image of an
"identifiable minor" would typically, but not necessarily, appear
to be of a minor; similarly, an image showing an actual minor would
probably also "appear to be a minor." On the other hand, images of
a purely fictional child might only satisfy the "appears to be a
minor" test. Under the statutory framework established by
Congress, a defendant charged with unlawful distribution or sale
would be entitled to a complete defense by showing that the person
depicted actually was an adult (provided that the material was not
promoted or presented to give the impression that it depicts an
actual minor). See 18 U.S.C. 2252A(c). The affirmative defense
is not made available, however, to those charged with unlawful
possession of child pornography. 
Congress broadened the scope of federal anti-child
pornography statutes to address a set of related concerns aimed at
the ultimate goal of destroying the underground supply of child
pornography in all of its manifestations. First, the legislature
desired to reduce the sheer volume of computerized child
pornography that could be used by child molesters and pedophiles to
"stimulate or whet their own sexual appetites." S. Rep. 104-358,
at pt. IV(B). 
Second, Congress sought to ban computer-generated images
that are "virtually indistinguishable" from those of real children,
but are made without live children. Id. These images can be
created with very little expense, and often are bought, sold, or
traded in the same manner as images created through the use of real
children. They can be downloaded from Internet Web sites, viewed
on computer screens, or stored on hard drives or floppy disks for
later use. Until now, such materials were largely beyond the reach
of federal law, which had focused on representations of actual
minors. 
Third, the new law was designed to protect the privacy of
actual children whose innocuous images are altered to create
sexually explicit pictures. Lawmakers hoped to deter the creation
of such invasive material and encourage the destruction of that
which currently exists. See id. at 2(7). 
Fourth, Congress wished to deprive child abusers of a
"criminal tool" frequently used to facilitate the sexual abuse of
children. After hearing from an array of experts, Congress
specifically found that virtual pornography created without the
involvement of real minors (often via computer technology alone) is
increasingly used by pedophiles and child molesters to seduce or
entice children into participating in sexual activity by breaking
down their natural inhibitions. Congress determined that "a child
who is reluctant to engage in sexual activity with an adult, or to
pose for sexually explicit photographs, can sometimes be convinced
by viewing depictions of other children 'having fun' participating
in such activity." Id. at 2(3). This material is routinely used
to instruct children how to perform certain sexual acts. Images
made by manipulating an innocent picture of a real child to show
sexual conduct can also be used to blackmail that child into
submitting to abuse and remaining in fearful silence about it. 
Congress deemed the threat of these forms of physical and emotional
abuse to be as grave as when images of real children are used, for
a child shown a computer-generated image cannot be expected to know
whether the child portrayed in an image is that of a real child or
merely a fanciful creation.
II
We recount the relatively short history of this case. On
December 17, 1997, a federal grand jury indicted Hilton for
criminal possession of computer disks containing three or more
images of child pornography in violation of 18 U.S.C. 
2252A(a)(5)(B). Well before trial, Hilton moved to dismiss the
indictment, mounting solely a facial attack on the CPPA. He argued
that the statute, by its terms, was unconstitutionally vague and
overbroad, and therefore unenforceable. 
On March 26, 1998, the United States District Court for
the District of Maine agreed. The court determined that the CPPA
was a content-neutral regulation "designed to ameliorate
significant harmful secondary effects of the protected speech
rather than suppress the speech itself." United States v. Hilton,
999 F. Supp. 131, 134 (D. Me. 1998). Nevertheless, the court
concluded that the statutory definition of "child pornography" was
both vague and overbroad. It found the "appears to be a minor"
language overly subjective, creating "substantial uncertainty for
viewers presented with materials depicting post-pubescent
individuals" because it may be difficult to distinguish between
teenagers and young adults. Id. at 136. The court further found
the definition unconstitutionally overbroad, impacting a
"significant amount of adult pornography featuring adults who
appear youthful." Id. at 137. Despite holding this portion of the
CPPA's definition of child pornography unconstitutional, the
district court made no effort to ascertain the impact of its ruling
on the statute as a whole by examining and applying the statute's
severability clause. Instead, it simply dismissed the indictment. 
The government now appeals.
III
The government attacks the district court's analysis in
several critical respects. It first questions the lower court's
conclusion that the statute is overbroad. In its view, the CPPA
does not reach innocuous pictures of children or criminalize
protected adult pornography. The government also takes issue with
the district court's determination that the Act is too vague. The
government urges us to hold that the statute allows persons of
ordinary intelligence to determine what types of material are
banned and to conform their conduct accordingly. To require
further specificity, it insists, would be not only impractical, but
unrealistic. Additionally, the government asks us to deem the
"appears to be a minor" standard to be grounded in prosecutorial
necessity because it is exceedingly difficult, if not impossible,
for an expert to discern whether an image is one of a real child. 
The broadening of the definition of child pornography is critical,
the government argues, because in more and more cases involving
virtual child pornography, the prosecution is unable to prove that
real children under a specified age are depicted. 
We turn our attention to familiar constitutional terrain. 
The First Amendment declares that "Congress shall make no law . .
. abridging freedom of speech." U.S. Const., amend. I. We offer
a few words about the doctrines that have developed over time to
give meaning to the protective force of the First Amendment. In
general, laws that aim only to prescribe the conditions under which
certain speech may be carried out may be upheld as neutral time,
place or manner restrictions. See United States v. Grace, 461 U.S.
171, 177 (1983) ("[T]he government may enforce reasonable time,
place, and manner regulations as long as the restrictions 'are
content neutral, are narrowly tailored to serve a significant
government interest, and leave open ample alternative channels of
communication.'") (citation omitted). But a statute or regulation
that discriminates based on the content of the speech itself
typically must comport with the following standards to survive a
constitutional challenge: it must be (1) animated by one or more
compelling state interests; and (2) narrowly tailored toward
fulfilling those concerns. Nevertheless, certain types of
expression chief among them fighting words, libel, and obscenity
are unprotected altogether. See R.A.V. v. City of St. Paul, 505
U.S. 377, 383-85 (1992). Child pornography falls into the category
of unprotected speech. See New York v. Ferber, 458 U.S. 747, 764
(1982). Finally, an otherwise valid law may be so overbroad that
it encroaches on protected expression or so vague that prosecuting
a person under the statute would effectively deprive that person of
due process of law. See Kolender v. Lawson, 461 U.S. 352, 357-58
(1983). 
For the sake of clarifying this area of law, we find it
necessary to point out that the district court misapplied the time,
place or manner doctrine by mistaking the CPPA for a content-
neutral law. A distinct line of cases upholds reasonably-crafted
regulations where the state acts not to suppress certain speech but
to direct, in a content-neutral way, how or when that speech may be
expressed in the public sphere. See, e.g., United States v.
Kokinda, 497 U.S. 720 (1990) (upholding federal regulation
prohibiting solicitation on postal property). Still, "[a]ny
restriction on speech, the application of which turns on the
content of the speech, is a content-based restriction regardless of
the motivation that lies behind it." Boos v. Barry, 485 U.S. 312,
335-36 (1988) (Brennan, J., concurring). Of course, if a law is
directed at the impact of the speech on its viewers, it cannot be
evaluated as a time, place or manner restriction. See Reno v.
American Civil Liberties Union, 521 U.S. 844, , 117 S. Ct. 2329,
2342-43 (1997) (rejecting argument that Communications Decency Act,
which banned on-line transmission of "obscene or indecent"
messages, was time, place or manner regulation); Forsyth County v.
Nationalist Movement, 505 U.S. 123, 134 (1992) ("Listeners'
reaction to speech is not a content-neutral basis for
regulation."). 
The CPPA fails both tests for substantive neutrality: it
expressly aims to curb a particular category of expression (child
pornography) by singling out that type of expression based on its
content and banning it. Blanket suppression of an entire type of
speech is by its very nature a content-discriminating act. 
Furthermore, Congress has not kept secret that one of its
motivating reasons for enacting the CPPA was to counter the primary
effect child pornography has on those who view it. See S. Rep.
104-358, at pt. III, IV(A) (reflecting congressional concern that
a "child molester or pedophile [may use] the material to whet his
sexual appetites," that child pornography "poisons the minds and
spirits of our youth," and that, if shown to children, the material
may "make children more susceptible of acceding to sexual demands
of would-be abusers); see also id. at pt. IV(B) (observing that "a
major part of the threat to children posed by child pornography is
its effect on the viewers of such material"). For these related
reasons, the child pornography law is plainly activated by a
"content-based classification of speech." Ferber, 458 U.S. at 763. 
Moreover, the statute makes no effort to permit
alternative methods of disseminating or possessing the material in
question. In this respect, the district court also erred in
finding that adequate alternative avenues of expression exist. The
CPPA is a quintessential content-specific statute, and therefore
cannot be properly understood as a time, place or manner
regulation. 
But to say that the CPPA is content-based does not end
the matter, for it is well-settled that child pornography, an
unprotected category of expression identified by its content, may
be freely regulated. We are asked to determine: first, whether the
statute's definition of child pornography, expanded in an effort to
outlaw computerized child pornography, satisfies the First
Amendment; and second, assuming its sweep is appropriate, whether
the law is adequately precise as to provide fair warning. 
To resolve these issues, we start by reviewing the
Supreme Court's pronouncements on the government's power to
regulate child pornography. In Ferber, the Supreme Court first
upheld the constitutionality of a state law proscribing the
distribution of material depicting sexual performances by children
under the age of 16. See 458 U.S. 747. In doing so, it carved out
an entire category of speech "which, like obscenity, is unprotected
by the First Amendment." Id. at 764. The Court likened child
pornography to obscenity in that both kinds of expression may be
banned, but explained that because of the state's "compelling
interest in prosecuting those who promote the sexual exploitation
of children," see id. at 761, a law regulating child pornography
need not adhere mechanistically to the three-part test for
obscenity originally enunciated in Miller v. California, 413 U.S.
15 (1973). One reason for allowing a departure from the obscenity
rule and, as a result, somewhat greater authority to regulate child
pornography is that "a work which . . . contains serious literary,
artistic, political, or scientific value may nevertheless embody
the hardest core of child pornography." Id. 
The Ferber Court did not establish a single one-size-
fits-all constitutional definition of child pornography (as the
Court arguably has done for obscenity), but provided general
guiding principles. Ultimately, to pass constitutional muster, a
particular anti-child pornography statute must be "adequately
defined." 458 U.S. at 764. In Ferber, the Court pointed out that
New York's prohibition was confined to works that "visually depict
sexual conduct by children below a specified age." Id. (Emphasis
in original). It was also persuaded that the law's definition of
sexual activity was "suitably limited and described." Id.
The Court further developed the contours of its child
pornography jurisprudence in Osborne v. Ohio, 495 U.S. 103 (1990). 
There, the Court evaluated a state law prohibiting the possession
and viewing of material depicting a nude minor "where such nudity
constitutes a lewd exhibition or involves a graphic focus on the
genitals." A defendant charged with unlawful possession attacked
the statute as overbroad and vague. Rebuffing his twin challenges,
the Court found that the statute was not aimed at controlling a
person's private thoughts, but had been enacted to "protect victims
of child pornography" and to "destroy[] a market for the
exploitative use of children." 495 U.S. at 109. The Osborne Court
explicitly approved the following legislative goals: stamping out
child pornography because it often serves as a record of abuse of
real children; and denying pedophiles and would-be child abusers
access to child pornography, which could be used to seduce or
coerce children into sexual activity. See id. at 110-11. The
former remains intricately tied to the need to protect real
children represented in the pictures, but the latter marks a
subtle, yet crucial, extension of a state's legitimate interest to
the protection of children not actually depicted in prohibited
images. 
As these cases demonstrate, the line between unprotected
child pornography and otherwise protected expression (including
possession of adult pornography, see Stanley v. Georgia, 394 U.S.
557 (1969)) is not entirely tangle-free. Nonetheless, four lessons
can be drawn from the decisions.
First, sexually explicit material may be seen to fall
along a constitutional continuum entitling it to varying degrees of
protection. At one end of the spectrum, pictures of actual
children in sexually compromising positions, deemed to have little
or no social value, are entitled to no constitutional protection. 
At the opposite end of the spectrum, non-obscene images involving
actual adults are entitled to full protection. Sexually explicit
material created without the benefit of a live child model but
which appears to depict an actual minor, or produced by having an
adult pose as a minor and later presented or sold as if it depicted
as an actual minor, arguably falls somewhere in between. 
Second, considerations beyond preventing the direct abuse
of actual children can qualify as compelling government objectives
where child pornography is concerned. When child pornography is
the target, government is justified in not only driving it from the
marketplace through aggressive anti-trafficking laws, but
forbidding the private possession or personal viewing of these
products altogether. See Osborne, 495 U.S. at 110 (approving of
state's efforts to "stamp out this vice at all levels in the
distribution chain"). In this sense, concerns about how adults may
use child pornography vis-a-vis children and how children might
behave after viewing it legitimately inform legislators' collective
decision to ban this material. 
Third, in effecting such a prohibition, a criminal
statute must cabin government authority by "adequately defin[ing]"
the type of image that is to be forbidden. The cases require not
only that the term "minor" be defined, but also that the type of
condemned sexual depiction be carefully described. 
Fourth, wherever the constitutional demarcation is to be
properly drawn, "greater leeway" ought to be afforded legislatures
to regulate sexual depictions of children. Ferber, 458 U.S. at
756. The Court's instruction to federal courts to permit Congress
slightly more room to operate in this area is bolstered by its view
that "[t]he value of permitting . . . photographic reproductions of
children engaged in lewd sexual conduct is exceedingly modest, if
not de minimis." Id. at 762. As a result, some discretion has
been given legislatures to set out the parameters of anti-
pornography restrictions. For instance, the Court has repeatedly
acknowledged that states have latitude to set the age at which an
image is of a child rather than an adult. See, e.g., United Statesv. X-Citement Video, Inc., 513 U.S. 64, 67 (1994) (upholding
federal law that employs 18 as age of majority); Ferber, 458 U.S.
at 749 (law set age of majority at 16). Congress and statehouses
have some leeway in defining the kind of sexual depiction to be
proscribed as well. See X-Citement Video, 513 U.S. at 78-79
(holding that it is constitutionally permissible to use either
formulation "lewd" or "lascivious" display of children's
genitals). 
With this analytic framework in mind, we turn to the task
of assessing the constitutionality of the CPPA. The initial step
is to ascertain the general scope of the statutory definition of
child pornography, a task of pure statutory interpretation. 
Comparison of the law with prevailing constitutional precepts then
follows. 
IV 
We first evaluate the district court's conclusion that
the CPPA is unconstitutionally overbroad. Overbroad statutes by
their nature present a host of difficulties for our system of
ordered liberty, not the least of which is a chilling effect on the
communication of lawful ideas. But a statute will not be
invalidated as overbroad unless its overbreadth is "real, but
substantial as well, judged in relation to the statute's plainly
legitimate sweep." Osborne, 495 U.S. at 112 (citation omitted). 
As the Court has admonished, the overbreadth doctrine is "strong
medicine" that should be utilized "only as a last resort." Ferber,
458 U.S. at 769 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613
(1973)). 
Judicial disinclination to employ the overbreadth
doctrine is rooted in several important considerations. The first
is an appreciation for the "wide-reaching effects of striking down
a statute on its face." Id. Another related reason is that it may
be inefficient to do so: facial invalidation is unwarranted if the
likely number of lawful applications of the challenged statute far
outstrips the few arguably problematic prosecutions under the law. 
It makes little sense to strike down an entire statute in response
to a facial attack when potential difficulties can be remedied in
future cases through fact-specific as-applied challenges. A third
reason to hesitate before invoking the overbreadth doctrine is that
doing so may be unwise. Deciding constitutional questions in the
abstract is a recipe for making bad law. See id. at 781 (Stevens,
J., concurring) ("Hypothetical rulings are inherently treacherous
and prone to lead us into unforeseen efforts; they are
qualitatively less reliable than the products of case-by-case
adjudication.").
The key question, then, is whether the CPPA poses
substantial problems of overbreadth sufficient to justify
overturning the judgment of the lawmaking branches. We conclude
that it does not. We begin with the language of the statute. To
the extent the CPPA criminalizes the possession, reproduction or
distribution of a visual representation of an actual minor engaged
in sexual conduct, it falls easily within the parameters
established by Ferber and Osborne. The government's interests in
deterring the direct abuse of children and destroying the illicit
child pornography trade amply justify these steps, and the CPPA's
methods of eradicating such images are appropriate. 
Whether or not the prohibition of material that "appears
to be" of a minor comports with the First Amendment is more
troublesome. At first blush, potential problems threaten to doom
the law. First and foremost, "appears" to whom? The statute
itself is silent as to whether the test is meant to be objective or
subjective or some combination of the two. On its face, the
statute might also reach depictions with political, artistic,
scientific, or educational value. If so, it is unclear whether
that would be constitutionally permissible. And if, as Hilton and
amici insist, the phrase "appears to be a minor" criminalizes
possession of adult pornography created with models over the age of
majority who look youthful, this too might pose additional
constitutional difficulties. 
A correct interpretation of the "appears to be a minor"
standard and a full understanding of the interplay between the
legal protections afforded an individual, we believe, puts the bulk
of these concerns to rest. As to the breadth of the material
covered by the statute, Congress's statements provide us with a
precise and limited understanding of the "appears to be" language. 
We are obligated to follow it. "Where a statute is susceptible of
two constructions, by one of which grave and doubtful
constitutional questions arise and by the other of which such
questions are avoided, our duty is to adopt the latter." 
Almendarez-Torres v. United States, 523 U.S. 224, , 118 S. Ct.
1219, 1234 (1998) (Scalia, J., dissenting) (quoting United States
ex rel. Attorney General v. Delaware and Hudson Co., 213 U.S. 366,
408 (1909)); see also Ferber, 458 U.S. at 769 n.24 ("When a federal
court is dealing with a federal statute challenged as overbroad, it
should . . . construe the statute to avoid constitutional problems,
if the statute is subject to such a limiting construction."); Viegav. McGee, 26 F.3d 1206, 1212 (1st Cir. 1994) ("In the absence of
clear legislative intent, we will not adopt an interpretation of a
statute that would render it constitutionally suspect."). 
We take our cue from the legislative record, which makes
plain that the new language was intended to target only a narrow
class of images visual depictions "which are virtually
indistinguishable to unsuspecting viewers from unretouched
photographs of actual children engaging in identical sexual
conduct." S. Rep. 104-358, at pt. I, IV(B). The Senate, in
enacting S. 1237, explicitly stated that the "appears to be"
language "applies to the same type of photographic images already
prohibited, but which does not require the use of an actual minor
in its production." Id. at pt. IV(C). The Senate clearly
indicated that, by employing the phrase "appears to be," it was
"extend[ing] [the prohibition against child pornography] from
photographic depictions of actual minors engaging in sexually
explicit conduct to the identical type of depiction, one which is
virtually indistinguishable from the banned photographic
depiction," and no further. Id. (Emphasis added).
A few observations logically flow from this narrow
construct. The primary one is that Congress meant only to extend
federal authority in an important but limited fashion to a specific
subset of visual images those which are easily mistaken for that
of real children. 
It follows that drawings, cartoons, sculptures, and
paintings depicting youthful persons in sexually explicit poses
plainly lie beyond the reach of the Act. By definition, they
would not be "virtually indistinguishable" from an image of an
actual minor. The CPPA therefore does not pose a threat to the
vast majority of every day artistic expression, even to speech
involving sexual themes. 
Hilton (and assorted amici) nevertheless insist that the
First Amendment allows regulation of sexually explicit material
only where actual children are abused in its creation. They also
contend that the statute is impermissibly expansive because it is
very difficult to determine whether a person looks 17 or 18; they
believe that the statute is bound to criminalize possession of
protected adult pornography. 
Their first argument amounts to an effort to draw a
bright line in an area of law in which courts have resisted
creating clear-cut categories. Relying on Ferber's discussion of
the importance of protecting children from sexual exploitation,
they argue that the Supreme Court has strictly limited regulation
of child pornography to images manufactured with the use of live
children. But we find no firm basis for this overly restrictive
reading of precedent. We do not read the cases to say that
Congress has power to remedy only the abuse of children during the
process used to produce traditional forms of child pornography. 
While the Court certainly has been concerned with the "surpassing
importance" of protecting the actual abuse of children who appear
in pornographic material, it has not limited the government's
authority to achieving that objective, and that objective alone. 
Ferber, 458 U.S. at 757. Rather, it has mandated that government
be permitted a certain degree of flexibility in how it chooses to
grapple with new problems presented by the evolving nature of the
child pornography industry. See Osborne, 495 U.S. at 110. The
cases do suggest, however, that an appropriate set of governmental
goals (and the government's methods of fulfilling those goals)
should be reasonably related to the primary aim of "safeguarding
the physical and psychological well-being" of children, and, by
extension, crippling the clandestine child pornography trade. Id.at 109 (citation omitted). 
The laws in force when the Court decided Ferber and
Osborne uniformly defined child pornography by focusing on material
involving the use of actual children. The Court in those cases
used, for purposes of its constitutional discussion, the statutory
definition of child pornography then before it. The legal issues
presented in this case, including Congress's justifications offered
for extending child pornography statutes to stem the flow of
virtual child pornography, have not been analyzed by this, or any
other, court of appeals. 
We think that it is a logical and permissible extension
of the rationales in Ferber and Osborne to allow the regulation of
sexual materials that appear to be of children but did not, in
fact, involve the use of live children in their production. Like
sexually explicit material produced with actual children, there is
little, if any, social value in this type of expression. In
constitutional terms, sexually explicit material produced without
the benefit of a live child model but giving the appearance as if
had been is more akin to traditionally unprotected child
pornography than adult pornography. The same is true of material
created by having a youthful-looking adult pose as a minor that is
sold or presented as though it contained a pornographic image of an
actual minor. Such depictions can be readily used so as to further
the child pornography trade or to facilitate the abuse of children.
The government's interest in safeguarding the welfare of
children is compelling in these situations. Computer-created or
enhanced material can be bought, sold, or traded like any other
form of child pornography, adding further fuel to the underground
child pornography industry. It can be used just as effectively as
pictures of actual children to entice or blackmail children into
cooperating with would-be abusers. Moreover, the material may have
been created through the abuse of an actual minor but altered so
that it may be impossible to show that a real child was ever
involved in its creation. As technology improves and access to
technology increases, efforts to eradicate the child pornography
industry could be effectively frustrated if Congress were prevented
from targeting sexually explicit material that "appears to be" of
real children. The government's interest in addressing these forms
of child pornography is no less powerful than in instances where an
actual child is actually used and abused during the production
process. We will not second-guess Congress's decision to address
the social ills posed by the various types of virtual child
pornography. 
Hilton's and amici's next objection also misses the mark. 
They maintain that the inherent difficulty of determining whether
a depicted person "appears to be" 17 or 18 renders the definition
overly broad. They fear that persons will be convicted of
possessing sexually explicit material of adults who look or dress
in a youthful manner. We think this danger is overstated. The
main flaw in the argument is its inordinate focus on the arguably
fuzzy line between age 17 and 18, a line which, as with many laws,
must be drawn somewhere. More importantly, we are satisfied that
the vast majority of prosecutions under the "appears to be a minor"
provision would involve images of pre-pubescent children or persons
who otherwise clearly appear to be under the age of 18. Congress,
relying on the opinion of experts, has determined that purveyors of
child pornography usually cater to pedophiles, who by definition
have a predilection for pre-pubertal children. See S. Rep. 104-
358, at 2, pts. IV(A), (C). The apparent age of a pre-pubescent
child can easily be established through objective proof. While it
is theoretically possible that there may be prosecutions of
individuals selling or possessing images of youthful-looking
adults, it is unlikely that they would comprise a substantial
proportion of the prosecutions under the statute. 
The existence of a few possibly impermissible
applications of the Act does not warrant its condemnation. As the
Court has repeatedly made plain, even if a statute at its margins
infringes on protected activity, the solution is not invalidation
of the entire scheme. See Frisby v. Schultz, 487 U.S. 474, 488
(1988) (declining to evaluate all "hypothetical applications" of
ordinance in resolving facial challenge). Whatever overbreadth may
exist at the edges are more appropriately cured through a more
precise case-by-case evaluation of the facts in a given case. SeeNew York State Club Assoc., Inc. v. City of New York, 487 U.S. 1,
14 (1988).
We recognize that the Court has said that adult models
may be employed under certain circumstances to simulate minors
posing in a sexually provocative manner for serious artistic,
educational, or scientific purposes. Indeed, in Ferber, the Court
observed that "if it were necessary for literary or artistic value,
a person over the statutory age who perhaps looked younger could be
utilized." 458 U.S. at 763; see also X-Citement Video, 513 U.S. at
72 ("[N]on-obscene, sexually explicit materials involving persons
over the age of 17 are protected by the First Amendment."). 
Take, for example, a film version of Nabokov's Lolita. 
A director might legitimately wish to employ a youthful-looking
adult to portray, in a non-obscene manner, a sexual encounter
between Lolita and Humbert. Similarly, use of an adult model to
simulate the sexual behavior of a child might be necessary for
scientific research. The social value of these works obviously
could not be shrugged off as de minimis. They would be far from
the "hardest core of child pornography." Ferber, 458 U.S. at 761. 
The First Amendment interest in permitting dissemination of such
material would be sufficiently strong to warrant its protection. 
At the same time, the government's countervailing interest in
protecting children "is likely to be far less compelling" when "the
depiction is a serious contribution to art or science." Id. at 776
(Brennan, J., concurring). Should the government decide to
prosecute someone for distributing or possessing such material, we
believe there would be an affirmative First Amendment defense
available to the accused, although we need not define now its
precise dimensions. Recognizing such a defense is consistent with
Congress's general view that the law generally "does not, and is
not intended to, apply to a depiction produced using adults
engaging in sexually explicit conduct, even where a depicted
individual may appear to be a minor." S. Rep. 104-358, at pt.
IV(C). It is also consonant with the Court's teachings in Ferber,
where the Court assumed that even if in some rare instance the
depiction of children performing sexual acts might be necessary for
literary or artistic reasons, "a person over the statutory age who
perhaps looked younger could be utilized." 458 U.S. at 763. 
We need not fully explore the details of this exception
today. Suffice it to say that the existence of a tiny fraction of
material that could conceivably qualify for heightened protection
but might nevertheless fall within the purview of the Act (i.e.,
where youthful adults pose as children for sexually provocative
images with redeeming social value) does not render the statute as
a whole substantially overbroad. The appropriate remedy is
reversal of an unconstitutional conviction should the circumstance
arise, not invalidation of the statute in toto at this stage. 
Once the phrase "appears to be a minor" is properly
understood, the constitutional barriers fall away. The fear of a
chilling effect on protected speech subsides. We conclude,
therefore, that the CPPA is not unconstitutionally overbroad.
V
We next consider whether the district court erred in
holding the CPPA unconstitutionally vague. The touchstone of our
system of justice is the right to fair warning of criminal charges. 
An ambiguous law fails to provide the requisite notice and
undermines public confidence that the laws are equally enforced.
The standard for overturning a law on vagueness grounds
is a stringent one. A statute will not be held void for vagueness
unless it fails to "define the criminal offense with sufficient
definiteness that ordinary people can understand what conduct is
prohibited and in a manner that does not encourage arbitrary or
discriminatory enforcement." Kolender, 461 U.S. at 357; see alsoUnited States v. Bohai Trading Co., 45 F.3d 577, 580 (1st Cir.
1995) (proper inquiry is whether statute "provide[s] a
constitutionally adequate warning to those whose activities are
governed") (citation omitted). When a law directly impinges on
freedom of expression, as the CPPA does here, we must scrutinize
the law with an even more skeptical eye. We are obliged do so
because the threat of severe criminal sanctions and the full force
of social stigma, coupled with uncertain notice of criminal
liability offered by a poorly-worded statute, "may well cause
speakers to remain silent rather than communicate even arguably
unlawful words, ideas, and images." Reno v. ACLU, 521 U.S. at ,
117 S. Ct. at 2345.
The district court found the CPPA unduly vague because it
believed the "appears to be a minor" standard to be purely
subjective in nature. To the contrary, we hold that the standard
is an objective one. A jury must decide, based on the totality of
the circumstances, whether a reasonable unsuspecting viewer would
consider the depiction to be of an actual individual less than 18
engaged in sexual activity. See S. Rep. 104-358, at pt. IV(C).
Without limiting a priori the type of evidence that would
be admissible on this question in a given case, the following proof
could be offered to establish the apparent age of the person shown:
the physical characteristics of the person; expert testimony as to
the physical development of the depicted person; how the disk,
file, or video was labeled or marked by the creator or the
distributor of the image, or the defendant himself, see, e.g.,
United States v. Robinson, 137 F.3d 652, 652 (1st Cir. 1998)
(photographs labeled by names, dates taken, and ages of boys
depicted); and the manner in which the image was described,
displayed, or advertised. While this list is hardly exhaustive, it
gives a flavor of the ways in which a depicted person's apparent
age might be objectively proven.
The element of scienter also must be satisfied by the
prosecution before a valid conviction may be obtained for
instance, the government must prove beyond a reasonable doubt that
an individual "knowingly" possessed the child pornography. See 18
U.S.C. 2252A(a)(5)(B). This statutory requirement serves as an
additional safeguard, for the government must show not only that
the individual purposefully acquired or distributed the material,
but that he did so believing that the material was sexually
explicit in nature and that it depicted a person who appeared to
him to be (or that he anticipated would be) under 18 years old. 
See X-Citement Video, Inc., 513 U.S. at 78 (holding that scienter
requirement in related anti-child pornography statute "extends to
both the sexually explicit nature of the material and to the age of
the performers"). 
The CPPA offers an added measure of protection. It
provides an affirmative defense if the person depicted actually was
an adult at the time the image was created. When the defense is
appropriate, the fact that the person depicted was a live model at
least 18 years of age typically will lead to dismissal of the
charge. Although Congress did not make the affirmative defense
available to someone accused of unlawful possession (as opposed to
any of the other offenses such as distribution), what an individual
actually believed to be the age of the depicted person still goes
to his state of mind in possessing the material. Thus, a defendant
who honestly believes that the individual depicted in the image
appears to be 18 years old or older (and is believed by a jury), or
who can show that he knew the images were created by having
youthful-looking adults pose for them, must be acquitted, so long
as the image was not presented or marketed as if it contained a
real minor. 
We believe, in short, that the statute's provisions
"suitably limit" the reach of the Act so that a person of ordinary
intelligence can easily discern likely unlawful conduct and conform
his or her conduct appropriately. The statute carefully defines
the term "minor." The scope of its prohibition, like the law
evaluated in Ferber, is restricted to visual images. The statute
describes, in painstaking detail, the types of sexually explicit
depictions of children that are forbidden. As the Court said in
Osborne, such limiting language "avoid[s] penalizing persons for
viewing or possessing innocuous photographs of naked children." 
495 U.S. at 114. 
We disagree with the district court's assumption that the
use of a legal standard requiring an evaluation of the appearance
of an image renders the test arbitrary or overly susceptible to
manipulation. Reasonable objective assessments of the impression
conveyed by a person's actions or how an image "appears" are
routinely made by judges and juries. See, e.g., Liteky v. United
States, 510 U.S. 540, 553 n.2 (1994) (noting that recusal motions
under 28 U.S.C. 455(a) are governed by "objective appearance of
partiality" test); Ferber, 458 U.S. at 751 (approved definition of
child pornography banned "simulated" sexual conduct, which in
ordinary usage means "to have or take on the appearance of");
Miller, 413 U.S. at 24 (obscenity depends in part on whether
material appeals to prurient interest of average person).
Yet Hilton returns to a familiar refrain: that it is
terribly difficult to distinguish between an apparent 17 year old
and an apparent 18 year old. This problem, he argues, renders the
statute unduly vague (as well as overbroad). We think not. As
discussed earlier, any number of objective signs should be enough
to warn an ordinary viewer of sexually explicit material of the
apparent age of the person depicted, including his or her physical
characteristics and how the image is labeled or marketed. And
those involved in the production of lawful sexually explicit
material can easily protect themselves by verifying the ages of the
models they employ or by taking steps to visually demonstrate that
a computer-generated image is meant to portray an adult. 
There is another reason why Hilton's vagueness challenge
fails: there are few equally efficacious alternatives. At oral
argument, defense counsel suggested that a better approach would be
to prohibit images of persons who are or appear to be "physically
sexually immature." Such a test, had Congress selected it, might
very well have been more precise than the one Congress chose to
adopt, which turns on the age or apparent age of the person
depicted. It is often said that because we are "[c]ondemned to the
use of words, we can never expect mathematical certainty from our
language." Grayned v. City of Rockford, 408 U.S. 104, 109 (1972). 
That lesson applies here. 
But even if the proffered standard were more exact, there
would still be a more fundamental problem it would fail to reach
a whole category of persons Congress intended to protect, namely,
those youngsters who appear "physically sexually mature" but are
under the age of consent. We reject the suggestion that Congress
must be confined to addressing pornographic images of some
children, but not others. Firmly satisfied that it is well within
Congress's power to regulate virtual pornography of minors of all
ages (infancy through age of majority as set by the legislature),
we are aware of few other linguistic approaches that would achieve
the same goals. Defendant's proposal does not fit the bill. The
"appears to be a minor" test, by comparison, is sufficiently
precise to pass constitutional muster and yet flexible enough to
meet the challenges posed by computerized child pornography. 
We see no reason to strike down the CPPA as
unconstitutionally vague. The language of the statute affords an
ordinary consumer of sexually explicit material adequate notice of
the kinds of images to avoid. The interaction between the
applicable legal standards, moreover, offers the average person
additional protection. These safeguards, working in concert,
minimize the danger that this law might be enforced in an arbitrary
or discriminatory fashion by overzealous police officers or
prosecutors.
The judgment of the district court is reversed.